MARY ELIZABETH BOULANGER

*v.*

GEORGE W. CHURCHILL et al.

[Decided May 22d, 1916.]

1. Evidence on a bill for the specific performance of an oral contract to live at another's farm, take charge of the entire house on certain terms as to expense, and to care for him, in consideration of a devise of the farm—*Held* to establish such contract.

2. To take an oral contract for the devise of land out of the prohibition of the act for the prevention of frauds and perjuries (*2 Gen. Stat. 1895 p. 1603 § 5*), it is necessary to establish by the clearest proof that the doctrine of part performance of parol contracts will apply.

3. An oral land contract may be specifically enforced, notwithstanding statute of frauds (*2 Gen. Stat. 1895 p. 1603 § 5*), requiring a written memorandum, provided that certain steps have been taken, after the contract has been made, toward putting it into effect; but payment in services will *not*, as a general rule, take the contract out of the statute so as to demand a specific performance of the contract.

4. Where an oral contract to devise land in consideration of services to be performed by the complainant could not be covered by the doctrine of part performance so as to take it out of the statute of frauds, the complainant's remedy was on the *quantum meruit*.

---

On pleadings and proofs in open court.

*Messrs. Smith, Mabon & Herr,* for the complainant.

*Messrs. Edwards & Smith,* for George W. Churchill and wife, the defendants.

*Mr. John F. Gough,* for the administrators, defendants.

*Mr. William Van Buskirk* and *Mr. Byrnes* (of the New York bar), for the other defendants.

LEWIS, V. C.

The bill in this case was filed for specific performance of an oral contract entered into between the complainant, Mary Elizabeth Boulanger and Romeo T. Churchill. Mrs. Boulanger, the complainant, testified at the trial of the cause, and died shortly thereafter, and the suit has been revived in the name of Anthony D. Boulanger, Jr., as complainant. Mrs. Boulanger was a niece of Mrs. Romeo T. Churchill, who died in June, 1912. Mrs. Boulanger, before her marriage, resided a great deal of her time with her aunt and uncle already mentioned, at their home in Secaucus.

Mr. and Mrs. Boulanger, at the time of the death of Mrs. Churchill, were living in Ridgefield Park with their four children,

in a house which they rented for $20 per month. Their household expenses were very low, not over thirty to forty dollars a month, exclusive of house rent. Mr. Boulanger was in business for himself and had a drawing account of $35 per week, besides profit which accumulated in the business. Mrs. Churchill, during her last sickness, sent for Mrs. Boulanger to nurse her, and when she died, Romeo T. Churchill made the agreement with Mrs. Boulanger on which this action is now based.

Anthony D. Boulanger, Jr., the substituted complainant, and who was the husband of Mary Elizabeth Boulanger, testified at the trial that at the time of the last illness of Mrs. Churchill, Romeo T. Churchill came to Ridgefield Park and asked Mrs. Boulanger to come down to take care of Mrs. Churchill and that he consented thereto as Romeo was so insistent; that after the death of Mrs. Churchill, two days thereafter, he had a conversation with Romeo at the barn on the place where Mr. Churchill lived in Secaucus. Mr. Boulanger's testimony on that subject was as follows:

"Q. What did he tell you?

"A. He said to me, 'Now Anthony, I spoke to Mame to-day about coming down here to take care of me; my health is very poor now, and now that Eliza is gone, I have nobody to look after me but Mame, and if she will do that and come down and take care of me, she shall have this property when I go;' we were at the entrance of the barn; we were facing the property at the time, facing the property in question; the barn is at the rear of the premises and we were at the barn entrance, and he was facing the property in question, and he said, 'She shall have this property.'

"I said, 'That is all right, but it won't be an easy matter to give up Ridgefield Park, our associations there;' and he said, 'That will be all right; the only one that will object to it will be Marion' [that is my daughter] and we can win her over;' and he said, 'You just tell Mame to sell all the furniture up there and dispose of whatever she can and try and get rid of that piano, because we will have one here, and if she will come down here she shall have all this furniture in the house.'

"Q. What did you say then?

"A. I said, 'Well, that is all very well, but what about the financial part of it; how shall we arrange about the running of the place?' He said, 'Oh, that is all right, Anthony; you just come down and run it to suit yourself; you board me and Gus, and pay Mrs. McConn's wages, and just take care of the expenses of the house, and I will take care of the rest of it; I will pay Gus's wages and the expenses of the barn, and any other expenses.' I said, 'I think that is going to make it a pretty expensive proposition to me; you know our expenses in Ridgefield Park

are very small now; I don't believe it costs us over $50 or $60 a month, and I will bet it will cost me two or three times as much as that down here;' and he said, 'It won't cost you that much;' and I said, 'Yes, it will;' and he said, 'It won't make any difference, because Mame will own this property some day anyway;' so I said, 'Well, I guess I will speak to Mame again about that before we do anything.'

"*Q.* That was all the conversation, was it, at that time?

"*A.* Yes, sir.

"*Q.* Then when was the next time you spoke to Romeo about it?

"*A.* The next evening.

"*Q.* The following evening; where were you then?

"*A.* At the same place, in the barn again.

"*Q.* Who was there on that occasion?

"*A.* Just he and I, and the man was around there, the man that died.

"*Q.* What was said on that occasion?

"*A.* He said, 'Anthony, have you made up your mind about that?' and I said, 'Yes, I spoke to Mame about it, and she has agreed to come down.'

"*Q.* Then what did you do?

"*A.* Then we walked into the house, and we walked into the dining-room and Mame was there at the time; and he said, 'Well, I feel relieved, Mame, that you are coming down.' He said, 'Frankie, you and I are going to be pals now for good.' Frankie is my boy."

Mr. Boulanger then testified that he and his wife and children moved on the 26th of June, 1912, and took up their residence at the home of Romeo T. Churchill and have been staying there ever since; that his wife took charge of the entire house and took care of everything, including Romeo, and took care of him during his sick spells and looked after him in every way possible. He says that Romeo was like a baby around the house, requiring a lot of attention, and that she nursed him; that he suffered from a chronic bronchial condition and that he would get into a sort of a spasm, and that she had to wipe his forehead with towels and get rid of the perspiration.

Mr. Eberhard, an attorney and counselor, testified that about a week before Mr. Churchill's death in 1914, he received a telephone call, and in response he went to see Mr. Churchill, and that Mr. Churchill said:

" 'Fred, I have got you out here for the purpose of arranging my affairs * * * and I want Mame to be taken care of, and she is to have all this * * * the house and all this.' I said, 'That is all right, Romey; now, shall I get ready?' and he said, 'No, don't get ready yet, because there is a whole lot of things that I have got, personal chattels and the bank stock, which I want to provide for. and I am trying to think of a way to dispose of them.' "

The evidence in this case is very voluminous. There is nothing in it indicating that the labor or services performed by Mrs. Boulanger were exceptional or extraordinary or that her whole course of life or lifework was changed by performance of the agreement. I am satisfied, however, that Romeo T. Churchill did enter into the oral contract with Mrs. Boulanger as charged in the bill; but I am also convinced that the complainant's case as proved is not within the cognizance of this court, for the following reasons: This was an oral contract for the devise of lands which is prohibited by the "act for the prevention of frauds and perjuries," approved March 27th, 1874. See *Gen. Stat. p. 1603* § *5*, and to take this case out of the statute, it would be necessary to establish by the clearest proofs that the doctrine of part performance of parol contracts will apply. This doctrine is, that oral land contracts may be specifically enforced, notwithstanding the statute's requirement of a written memorandum, provided that certain steps have been taken, after the contract has been made, toward putting it into effect. This doctrine is firmly established in England and in all the state jurisdictions with few exceptions, and has ever been confirmed in many of the states by statute.

In case of oral contracts where the vendee, in pursuance of the oral contract, goes into possession of the land with the consent of the vendor, and makes valuable improvements, we find an instance where courts of equity will enforce the contract in spite of the statute.

Payment, however, is not an act which demands the specific performance of an oral contract.

Payment in services will not, as a general rule, take the contract out of the statute any more than payment in money; but some services cannot be measured by their money value, and were not intended to be so measured. Services of affection rendered by a child to its parent, rendered as consideration for an oral promise, cannot be compensated by money damages.

I find, however, that the case under consideration cannot be covered by this doctrine of part performance so as to take it out of the statute, and I think the complainant's remedy is on the *quantum meruit*. *Cooper* v. *Colson et al., 66 N. J. Eq. 328.*

A decree dismissing the bill is accordingly advised.